Filed 10/14/14  In re Z.A. CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re Z.A., a Person Coming Under the Juvenile Court Law. | B254595 (Los Angeles County Super. Ct. No. CK90537) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. RUTH D., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Veronica Simmons McBeth, Judge.  (Retired judge of the L.A. Sup. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed.

Christoper R. Booth, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Denise M. Hippach, Deputy County Counsel, for Plaintiff and Respondent.

# INTRODUCTION

In this appeal from an order terminating parental rights, Ruth D. contends that the parent-child relationship exception to adoption (Welf. & Inst. Code,[1] § 366.26, subd. (c)(1)(B)(i)) applied and precluded the juvenile court from terminating her parental rights over her daughter Z.A. We affirm.

# FACTUAL AND PROCEDURAL BACKGROUND

A.     *The Events Preceding Dependency Proceedings*

Ruth D. and Juan A., Sr., (Juan Sr.)[2] are the parents of Brandon A. (Brandon), Juan A. (Juan)[3] and Z.A., as well as two adult children. On October 27, 2011 officers from the Los Angeles Police Department took Brandon and Juan, 12 and 11 respectively at the time, into protective custody and held them at the police station. The boys had been left alone overnight, and their parents' whereabouts were unknown.

A children's social worker (CSW) from the Los Angeles County Department of Children and Family Services (the Department) spoke to Brandon and Juan at the police station. Brandon stated that his mother often left home to visit friends in "the Valley." On October 26, 2011 Ruth D. left around 6:00 p.m. and took Z.A., then four years old, with her. Brandon and Juan stayed home with Juan Sr. Around 11:00 p.m. Juan Sr. left and did not return. Juan stated this was the second time they had been left alone. The children did not know how to contact their parents.

---

[1]     All statutory references are to the Welfare and Institutions Code.

[2]     Juan Sr., whose parental rights the juvenile court also terminated, is not a party to the appeal.

[3]     The juvenile court also terminated Ruth D.'s parental rights over Brandon and Juan. Ruth D. does not challenge this portion of the order.

Brandon and Juan also told the CSW that they had not been going to school regularly. The CSW contacted their school and learned that they had been absent from October 7 to 21, 2011. On October 21 Brandon was suspended from school. He was supposed to return on October 24, but neither Brandon nor Juan returned to school that week.

The CSW also spoke to Brandon and Juan's maternal uncle, Hector D., who expressed his concerns for the children's well being. Hector D. stated that Ruth D. and Juan Sr. had a history of leaving the children at home without supervision.

Efforts by both the police and the CSW to contact the parents were unsuccessful. The CSW took custody of the children and placed them in foster care.

On October 28, 2011 Ruth D. called the CSW. Ruth D. stated that she had left Brandon and Juan with Juan Sr. and did not know he had left the boys alone. Ruth D. admitted that the children could not reach her because she did not have a cell phone. When the CSW asked about Z.A., Ruth D. said Z.A. was with her. The CSW advised Ruth D. that Z.A. had to be taken into protective custody and asked Ruth D. to bring Z.A. into the Department. Ruth D. refused and would not tell the CSW where she and Z.A. were. The CSW informed Ruth D. that a hearing was scheduled for November 1. Ruth D. said she and Z.A. would attend. Ruth D., who had been trying without success to contact Juan Sr., did not know where he was.

B. *The Department Institutes Dependency Proceedings*

In a petition filed on November 1, 2011 the Department alleged that all three children were dependent children within the meaning of section 300, subdivision (b), and that Z.A. also was a dependent child within the meaning of subdivision (j) of section 300. Specifically, the Department alleged that on October 26, 2011, Juan Sr. had left Brandon and Juan home alone at night without adult supervision and that on prior occasions Ruth D. and Juan Sr. had left the boys at home by themselves without adult supervision, thereby endangering them and placing them and their sister at risk of harm.

3

Ruth D. and all three children appeared at the detention hearing. The juvenile court found that Juan Sr., who was not present, was an alleged father. Over the Department's objection, the court released the children to Ruth D. The court noted that Ruth D. had made an appropriate plan for the children to reside with their paternal aunt Eugenia V. and her partner Janet C.

### C. *The Section 385 Petition*

After the detention hearing, the Department learned that the children previously had been exposed to physical abuse and domestic violence, that Juan Sr. has an extensive criminal and substance abuse (crack cocaine and marijuana) history, and that Ruth D. occasionally smoked marijuana with Juan Sr.[4] On November 18, 2011 the juvenile court granted the Department's request for authorization to remove all three children from Ruth D. The Department then detained the children from Ruth D. and placed them in foster care.

On November 23, 2011 the juvenile court held a detention hearing on the section 385 petition. The court ordered the children detained, placed them in the home of Eugenia V. and Janet C., and ordered monitored visits for Ruth D.

### D. *The First Amended Section 300 Petition*

On November 29, 2011 the Department filed a first amended section 300 petition on behalf of the children. In addition to the allegations contained in the original section 300 petition, the Department alleged that the parents had a history of domestic violence and engaged in violent altercations in the children's presence; that Ruth D. physically abused Juan by hitting him with a golf club, a belt, extension cords, game controllers, and rose stems; that the parents physically abused Brandon and Z.A. by striking them with a belt and remote controls; that Juan Sr. has a history of drug use and

---

[4] On November 3, 2011 Ruth D. tested positive for cannabinoids.

currently used cocaine and marijuana; and that Ruth D. has a history of drug use and currently used marijuana.

### E.     *The Jurisdiction and Disposition Hearings*

At the December 13, 2011 jurisdiction hearing, the juvenile court sustained the counts alleging physical abuse and drug usage by Ruth D. and Juan Sr. with minor amendments. At the January 3, 2012 disposition hearing the juvenile court declared Brandon, Juan, and Z.A. dependent children of the court under section 300, subdivisions (a), (b), and (j). The court removed the children from the custody of both parents and ordered family reunification services for Ruth D. only.[5] These services were to include domestic violence counseling, parent education, individual counseling to address case issues and anger management, and conjoint counseling with the children when appropriate. The court also ordered Ruth D. to submit to six drug and alcohol tests and, if she missed a test or tested positive, to participate in a full substance abuse program.

### F.     *The Reunification Period*

During the first six months of Ruth D.'s reunification services, the Department finally had contact with Juan Sr. and learned he was living with Ruth D. in Van Nuys. On February 16, 2012 Ruth D. and Juan Sr. called the CSW and told her they recently married because "they wanted to do 'things right by God.'" The CSW informed Juan Sr. that he could petition the juvenile court to receive family reunification services. Juan Sr. said he did not want to go to court because he had an outstanding arrest warrant, and, if he went to jail, he would be deported. The CSW said that the Department would not report him to immigration authorities and going to court should not result in an arrest.

---

[5]     As of the disposition hearing Juan Sr. had yet to contact the Department, and his whereabouts were unknown. The juvenile court did not order reunification services for Juan Sr. because he was only the children's alleged father.

On February 17, 2012 the CSW met with Juan Sr. at her office. Juan Sr. expressed an interest in visiting his children. The CSW told him that his visits would be monitored. She also told him that he did not have family reunification services and would have to petition the court to receive them. Juan Sr. stated his belief that he would end up in jail because he had an immigration issue and was scheduled for deportation. Juan Sr. did not believe the CSW when she said the Department only offers family services and does not report parents to immigration authorities.

On August 9, 2012 Ruth D. gave the CSW various documents, including an application for a temporary restraining order against Juan Sr., which she had filed on August 7. Ruth D. explained that she was requesting a restraining order to prevent Juan Sr. from coming near her home and children. Ruth D. "no longer want[ed] to be disrespected by him."

On August 15, 2012 the CSW conducted an inspection of Ruth D.'s apartment, and found no safety concerns. Ruth D. did not know Juan Sr.'s whereabouts, but was trying to find him so that she could serve him with court documents.

On August 22, 2012 the juvenile court held a contested six-month review hearing. The juvenile court found that Ruth D. was in compliance with the case plan but that returning the children to their parents would create a substantial risk of detriment to the children. The court ordered the Department to provide Ruth D. with another six months of reunification services, as well as unmonitored two-hour visits with the children.

On October 16, 2012 the Department filed a section 388 petition asking the court to change its August 22 order granting Ruth unmonitored visitation. The Department asked the court to convert Ruth D.'s visits back to monitored, because the Department had learned that Ruth D. had allowed Juan Sr. to accompany her on her visits with the children. Although Ruth D. previously claimed she had obtained a restraining order and stated that Juan Sr. had gone to Oregon, she now claimed that "'the Lord' will help her restore her relationship with" Juan Sr. On December 17, 2012 the court granted the Department's petition and ordered Ruth D. to have visits in a neutral setting and supervised by a monitor approved by the Department. The court further gave the

6

Department discretion to liberalize Ruth D.'s visits if Juan Sr. was not present during visits.

On January 22, 2013 the CSW met with Ruth D. and asked her if she knew Juan Sr.'s current whereabouts. Ruth D. said that Juan Sr. did not live with her anymore and she did not know where he was. Ruth D. was thinking about getting a legal separation or divorce from Juan Sr. and obtaining a permanent restraining order against him. When the CSW asked Ruth D. when she planned to take these steps, Ruth D. said she did not know but was thinking about it. The CSW recalled, however, that Ruth D. had previously obtained a temporary restraining order but had failed to follow through and obtain a permanent restraining order, and had instead resumed her relationship with Juan Sr. Ruth D. later told the CSW that Juan Sr. was in Oregon and that she had not spoken with him in over a month.

In a report prepared for the 12-month review hearing, the Department observed that, "[a]t this time, it would be detrimental to return the children to their mother's care as the issues that brought the family to the Department's attention have not yet been mitigated. Although mother has complied with most of the Court's orders (parenting program, drug and alcohol program, and domestic violence program), mother has yet to participate in individual counseling to address case issues, including anger management, per Court's order dated 01/03/12. . . . [The] CSW observed mother still appears to have anger management issues, and appears she ha[s] not dealt with or understand domestic violence issues, as evidenced by the fact that she renewed her relationship with father, [Juan Sr.], who is the perpetrator of their domestic violent relationship, perpetrator of physical abuse toward the children, as well as having a history of substance abuse. Furthermore, mother married father on 02/14/12 (while the case is still open with [the Department])." The Department noted that "[a]s of today, mother has yet to provide and show[] the Department evidence she is able to protect the children from father, the perpetrator of physical abuse and domestic violence. As of today, the Department remains concern[ed], even though mother completed most of the Court ordered programs, mother appears to still remain hopeful to reconcile with father, once the children are

7

returned to her care." The Department recommended that the juvenile court terminate Ruth D.'s family reunification services and set the matter for a selection and implementation hearing pursuant to section 366.26.

On February 1, 2013 the CSW made an unannounced visit to Ruth D.'s apartment. Ruth D. had previously told the social worker that she was the only person living in the apartment, and that Juan Sr. left for Oregon. When the CSW knocked on the door, Ruth D.'s adult son, Johnny A., opened the door. The CSW saw another male in the apartment watching television and detected the strong smell of marijuana. When the CSW asked if they were smoking marijuana, Johnny A. confirmed that they were. The CSW also inquired as to Juan Sr.'s whereabouts. At first Johnny A. said he did not know, but then stated "he is in Oregon or something." Johnny claimed to not know when his father was coming back. The CSW asked to see the unit, but Johnny said he and his friend were about to leave. The CSW also spoke with a tenant who stated that the family fights every week. The tenant further stated that "they are very loud, and they fight like they were about to kill each other." When the CSW asked the tenant who was living in Ruth D.'s apartment, the tenant stated that the family consisted of a mother, father, and adult son.

At the February 26, 2013 12-month review hearing the juvenile court found that Ruth D. was not in compliance with the case plan, that the children could not be returned to her, and that there was no substantial probability they would be returned to her in six months. The court terminated her family reunification services and scheduled a selection and implementation hearing pursuant to section 366.26.

G. *Ruth D.'s Failed Attempt To Obtain a Temporary Restraining Order*

On May 6, 2013 Ruth D. filed another request for a temporary restraining order in the juvenile court. According to Ruth D., Juan Sr. came to her home in April and refused to leave. Ruth D. was fearful of Juan Sr. returning to her home. The court issued a temporary restraining order that expired on May 28 and scheduled a hearing on an order to show cause for May 28. Counsel for Ruth D. subsequently informed the court that

Ruth D. was unable to serve Juan Sr. with the temporary restraining order and was not requesting that the court reissue the temporary restraining order.

H. *The Section 366.26 and Section 388 Hearings*

In a report prepared for the section 366.26 hearing, the Department stated that the children were well-adjusted in the home of their caregivers and "well integrated into the lifestyle of the family." The Department reported that the caregivers "had a close relationship with the children prior to them being placed in their home," the children had a "strong attachment" to caregivers, and the caregivers wanted to adopt the children.

On June 24, 2013 the juvenile court continued the section 366.26 hearing to the next day so that Juan Sr., who had been located at the Men's Central Jail in Los Angeles, could be transported to court for the hearing. The following day, the trial court continued the matter again.

On August 27, 2013 the juvenile court identified adoption by the children's caregivers as the permanent plan and continued the section 366.26 hearing for completion of the home study. The Department reported that Brandon liked living with his aunts and stated he wanted them to adopt him. Juan also stated he wanted to live with his aunts. Z.A. said she wanted to live with her mother again but that she also liked living with her aunts. Z.A. stated the she loved her caregivers and wanted to be with them forever.

On November 15, 2013 Ruth D. and Juan Sr. each filed a section 388 petition. Ruth D. asked the juvenile court to issue a home of parent order or, in the alternative, reinstate her family reunification services and grant her unmonitored visitation. Juan Sr. asked the juvenile court to declare him the presumed father of the children, to order family reunification services for him, and to take the section 366.26 hearing off calendar.

On January 29, 2014 the court held a hearing on the parents' section 388 petitions, as well as a selection and implementation hearing. Melinda Murphy, a social worker investigator, testified on behalf of Ruth D. On August 7, 2013 Murphy observed a visitation by Ruth D. with her children at a Department office.

During the visit Murphy noticed that Z.A. touched her mother a lot and talked to her. Z.A. was a little anxious at times, but she sat on her mother's lap. Ruth D. was able to comfort Z.A. and calm her down. Murphy found that Ruth D. and Z.A. had similar personalities and demeanor. Murphy testified that the "little girl, I think, loves her mother. She likes being around her mom. There is delight in her face when her mom would touch her, and pay attention to her. She'd seek out her mother." Murphy added that "[t]hey seemed like mother and daughter. They would finish each other's sentences. The mom seemed to be able to calm the little girl. And it was like all was right in the world when the little girl was with the mom." Murphy described Brandon as "very laid back, a little bit closer to mom." Murphy noted, however, that "something is happening" with Juan, and he was sitting farther away from his mother. Juan held back and "[h]e looked at her like there was some issues there."

Murphy stated her belief that "it would be detrimental for [Z.A.] not to have her mom in her life. I think mom would be another parental figure in her life." The juvenile court then asked Murphy: "How can you say they had a parent-child relationship when you watched them for an hour and a half? I don't hear mother brought food. Did she?" After Murphy answered in the affirmative, the court asked, "Did she give it to them or something? I'm trying to hear something parental." Murphy responded, "I hear what you're saying. She did bring them food — healthy food. What I found parental was — what I mean is she — as a parent, you want to be very approachable to your teenager and just listen. That's the part that really struck me. I don't think I can say anything else." Murphy said that she observed a little girl who knows and loves her mother.

Janet C. testified that the visits with Ruth D. in the summer of 2013 had a detrimental effect on the children. Ruth D. verbally attacked Juan during these visits. She repeatedly put him down and argued with him. Matters escalated when Brandon defended Juan and Ruth D. argued with both boys. At one point, Brandon and Juan stopped visiting their mother, so only Z.A. would attend the visits. At that time Z.A. "was a typical little girl." She was "excited to see her mom."

When the number of visits decreased to one visit per month, the children were able to focus on their daily activities and studies. The children would appear "frustrated" after visits with Ruth D. Ruth D. did not ask them how they were, but talked about religion, telling them that the Lord would protect them, and that she believed in him and trusted him.

Janet C. also testified that she and Eugenia V. experienced behavioral problems with Z.A. after her visits with Ruth D. when Ruth D. told Z.A. to listen only to God, and not her caregivers or the CSW. Ruth D. also frequently spoke about the dependency case by telling Z.A. to have faith in God, that everything will work out, and that she would be going home.

Janet C. acknowledged that she and Eugenia V. had been caring for the children since November 23, 2011, and testified that she is ready to adopt them. Janet C. testified that throughout the two-year life of this case Ruth D. only missed one or two visits. When the children first came to live with her and Eugenia V., Brandon would not sleep at night, and he and Juan had night sweats. Z.A. had nightmares and would wake up crying and yelling. She had a nightmare that her father was going to kidnap her. Janet C. further testified that after Z.A. came home from visits with Ruth D., "we [would] have to give her more attention and more love." They tried to distract her and make it more pleasant before she went to sleep in an effort to calm her. Janet C. also recalled that the behavior of the children changed following conjoint counseling sessions with their mother "not in a good way." She said that the children were "really upset" and did not want to go to therapy because the therapist did not help them communicate with their mother.

Janet C. talked to Z.A. about the possibility that she would not be able to visit her mother. Z.A. said that she understood and that she did not understand why her mother kept returning to her father when he continued to hurt her. Janet C. said she never told Z.A. her parents were back together, but Z.A. had figured it out when her mother showed her pictures and took them without court permission to see their father.

11

After listening to the testimony of Murphy, Janet C., and Juan Sr., the juvenile court denied Ruth D.'s section 388 petition. The court granted Juan Sr.'s request for presumed father status and otherwise denied his section 388 petition. As to the section 366.26 issues, the juvenile court found that the children were adoptable. Concluding that "[n]o exception to adoption applies," the court terminated the parental rights of Ruth D. and Juan Sr. over Brandon, Juan, and Z.A., and transferred care, custody and control of the children to the Department for adoptive planning. Ruth D. timely appealed.

**DISCUSSION**

The juvenile court must select a permanent plan for a dependent child at a selection and implementation hearing held pursuant to section 366.26. (*In re I.R.* (2014) 226 Cal.App.4th 201, 210; *In re G.C.* (2013) 216 Cal.App.4th 1391, 1397; *In re R.N.* (2009) 178 Cal.App.4th 557, 564.) "Adoption is the Legislature's preferred permanent plan. [Citation.] '"Only if adoption is not possible, or if there are countervailing circumstances, or if it is not in the child's best interests are other, less permanent plans, such as guardianship or long-term foster care considered." [Citation.] Adoption, of course, requires terminating the natural parents' legal rights to the child; guardianship and long-term foster care leave parental rights intact. After the parent has failed to reunify and the court has found the child likely to be adopted, it is the parent's burden to show exceptional circumstances exist.' [Citation.]" (*In re D.M.* (2012) 205 Cal.App.4th 283, 290; see § 366.26, subds. (c)(1), (c)(4)(A); *In re Michael G.* (2012) 203 Cal.App.4th 580, 588.)

If the juvenile court determines that a child is adoptable, the court must terminate parental rights and select adoption as the permanent plan unless the "'court finds a compelling reason for determining that termination would be detrimental to the child'" under one of the exceptions listed in section 366.26, subdivision (c)(1)(B). (*In re D.M.*, *supra*, 205 Cal.App.4th at p. 290.) Under the parent-child relationship exception, on which Ruth D. relies, the parent has the burden of proving by a preponderance of

evidence that termination of parental rights would be detrimental because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i); see *In re G.B.* (2014) 227 Cal.App.4th 1147, 1166.)

"The exception's second prong requiring that 'the child would benefit from continuing the [parent-child] relationship' means that 'the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.' [Citation.] The juvenile court 'balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer." [Citation.] 'If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated.' [Citation.]" (*In re C.B.* (2010) 190 Cal.App.4th 102, 124; see *In re C.F.* (2011) 193 Cal.App.4th 549, 555.)

"[F]requent and loving contact is not sufficient to establish this benefit absent a significant, positive emotional attachment between parent and child. [Citations.]" (*In re I.R.*, *supra*, 226 Cal.App.4th at p. 213; see *In re Marcelo B.* (2012) 209 Cal.App.4th 635, 643.) "[T]he parent must . . . be more to the child than a mere 'friendly visitor or friendly nonparent relative.'" (*In re Helen W.* (2007) 150 Cal.App.4th 71, 81.) ""'Interaction between [a] natural parent and child will always confer some incidental benefit to the child . . . ."' [Citation.] For the exception to apply, 'a parental relationship is necessary . . . .' [Citation.] '"While friendships are important, a child needs at least one parent. Where a biological parent . . . is incapable of functioning in that role, the child should be given every opportunity to bond with an individual who will assume the role of a parent." [Citation.]' [Citation]." (*In re J.C.* (2014) 226 Cal.App.4th 503, 529.) "'The exception must be examined on a case-by-case basis, taking into account the many variables which affect a parent/child bond. The age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction

between parent and child, and the child's particular needs are some of the variables which logically affect a parent/child bond.' [Citation.]" (*In re C.B.*, *supra*, 190 Cal.App.4th at p. 124.) The juvenile court may conclude that the parent-child relationship exception to adoption does not apply either because (1) the parent failed to maintain regular visitation and contact with the child and the child would not benefit from continuing the relationship (a factual finding), or (2) an existing parent-child relationship does not constitute "a compelling reason for determining that termination would be detrimental to the child" (a discretionary determination). (§ 366.26, subd. (c)(1)(B); see *In re K.P.* (2012) 203 Cal.App.4th 614, 621-622; *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315.)[6]

When reviewing the juvenile court's determination that the parent-child relationship exception to adoption does not apply, we apply a composite standard of review. (*In re K.P.*, *supra*, 203 Cal.App.4th at pp. 621-622.) With regard to the court's factual findings, the applicable standard of review depends on whether or not the parent sustained his or her burden of proof on a particular issue. When, as here, the juvenile court determines that a parent has not satisfied his or her burden of proof, we decide whether, as a matter of law, the evidence compels a finding favorable to the parent. (See *In re I.W.* (2009) 180 Cal.App.4th 1517, 1528 ["where the issue on appeal turns on a

---

**6** Ruth D. argues that "the *Bailey J.* and *K.P.* approach is wrong because it conflates the two *actual* elements of the exception – (1) regular visitation and (2) the ensuing benefit to the child – and mutates the plain, unambiguous language of the statute, *reading in* a third element involving the words 'compelling reason.'" Ruth D. asks us "to recognize this, and to help stop this disturbing judicial trend in dependency law." In Ruth D.'s view, regular visitation and a benefit to the child from continuing the relationship are sufficient to preclude the termination of parental rights because together they constitute the "compelling reason" that mandates a finding of detriment. We adhere to our decision in *In re K.P.*, *supra*, 203 Cal.App.4th 614, which followed *In re Bailey J.*, *supra*, 189 Cal.App.4th 1308. Section 366.26, subdivision (c)(1)(B)(i), requires the juvenile court to determine whether the parent visited regularly, whether the child would benefit from continuing the relationship, and, if so, whether there is a compelling reason for determining that termination of that bond would result in detriment to the child.

failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law"].)  If the juvenile court determines that a parent has satisfied his or her burden, we apply the substantial evidence standard of review.  (See *In re K.P.*, *supra*, at p. 622.)  Finally, if the court in the exercise of its discretion concludes there is a parent-child relationship but that the benefit to the child is not sufficiently compelling to outweigh the benefit of adoption, we review that conclusion for abuse of discretion.  (See *ibid.*; *In re Bailey J.*, *supra*, 189 Cal.App.4th at p. 1315.)

The juvenile court stated that "at this point with Mother and Father, I cannot say that I see a bond that would be detrimental for the children to lose."  The court stated, "I have not seen by either counsel that it is in the best interest of these children not to terminate parental rights at this time.  They need stability that their caregivers wish to give them.  I find the caregiver's testimony to be honest and truthful."  The court concluded that the parent-child relationship exception to the termination of parental rights did not apply, and terminated Ruth D.'s parental rights.

The record reflects, and the Department acknowledges, that Ruth D. satisfied the first prong of the exception.  The record also reflects, however, that the visits were often problematic.  For example, Ruth D. had conflicts with Brandon and Juan that had a detrimental effect on them.  Ruth D. repeatedly violated the Department's visitation rules and expectations by discussing the case with the children, telling them they were returning home soon, speaking Spanish to the children in the presence of a non-Spanish speaking monitor, whispering to the children, having angry outbursts in the presence of the children, accusing the CSW, the Department, and the government of being evil, telling the children they were "being brainwashed," and using "prayer to God with the children to talk about the case."  She also told Z.A. not to listen to her caregivers or the CSW, which caused Z.A. to misbehave.  Ruth D. effectively put her needs above those of her children, and her conduct reflected a lack of concern for how her negative behavior and poor decisions affected her children.

15

Although Ruth D. undoubtedly loves Z.A., Ruth D.'s needs were not paramount at this point in the dependency proceedings. "It is true a parent and a child share a fundamental interest in reuniting up to the point at which reunification efforts cease. [Citation.] However, the interests of the parent and the child have diverged by the point of a [section 366].26 hearing to select and implement a child's permanent plan. [Citation.] '[C]hildren have a fundamental independent interest in belonging to a family unit [citation], and they have compelling rights to be protected from abuse and neglect and to have a placement that is stable, permanent, and that allows the caretaker to make a full emotional commitment to the child.' [Citation.] Adoption gives a child the best chance at a full emotional commitment from a responsible caretaker. [Citation.] [¶] Consequently, after reunification efforts have terminated, the court's focus shifts from family reunification toward promoting the child's needs for permanency and stability. [Citation.] . . . Mother's best interests are simply no longer the focus." (*In re J.C.*, *supra*, 226 Cal.App.4th at p. 527.)

*In re S.B.* (2008) 164 Cal.App.4th 289 and *In re Jerome D.* (2000) 84 Cal.App.4th 1200, on which Ruth D. relies, are distinguishable.[7] In *S.B.*, where the court reversed an order terminating the father's parental rights over his daughter, there was a bonding study that showed the bond between the father and S.B. was "fairly strong" and that "there was a potential for harm to S.B. were she to lose the parent-child relationship." (*In re S.B.*, *supra*, at p. 296.) The court noted that the father "maintained a parental relationship with S.B. through consistent contact and visitation. His devotion to S.B. was constant, as evinced by his full compliance with his case plan and continued efforts to regain his physical and psychological health. The record shows S.B. loved her father, wanted their

---

**7** Ruth D. also cites *In re Brandon C.* (1999) 71 Cal.App.4th 1530. *Brandon C.* was an appeal by the Department from an order selecting guardianship as the permanent plan for twin boys. The court affirmed the order, concluding that substantial evidence supported the trial court's finding that it was in the children's best interest to maintain their relationship with their mother. *Brandon C.* is procedurally very different from this case and did not involve the termination of parental rights.

16

relationship to continue and derived some measure of benefit from his visits.  Based on this record, the only reasonable inference is that S.B. would be greatly harmed by the loss of her significant, positive relationship with [her father]." (*Id*. at pp. 300-301.)  The court concluded that the juvenile court had "erred when it found the continuing beneficial relationship exception did not apply and terminated parental rights.  [Citation.]" (*Id*. at p. 301.)  Here, there was no bonding study showing that termination of parental rights would be detrimental to Z.A.[8]  While Ruth D. consistently visited with her children, she did not always act appropriately with them.  Unlike the father in *S.B.*, Ruth D. did not do everything she could to regain custody of her children.  While she completed most of her case plan, she did not complete the individual counseling component.  She also continually returned to a man who had physically abused her and the children.  (See *In re Jason J.* (2009) 175 Cal.App.4th 922, 937 [noting that *S.B.* "must be viewed in light of its particular facts" and does not "stand for the proposition that a termination order is subject to reversal whenever there is 'some measure of benefit' in continued contact between parent and child"].)

In *Jerome D.* the juvenile court found that the mother had maintained regular visitation and contact with Jerome and had a parental relationship with him.  (*In re Jerome D.*, *supra*, 84 Cal.App.4th at p. 1206.)  In addition, a psychologist who observed Jerome and his mother "opined that if the relationship were severed Jerome would grieve and could experience emotional and behavioral difficulties, and that continued contact would benefit him developmentally." (*Id*. at p. 1207.)  Jerome, who was nine at the time of the section 366.26 hearing, had lived with his mother for the first six and a half years

---

**8**    While Murphy opined that termination of parental rights would be detrimental to Z.A., Murphy had only witnessed one visit between Ruth D. and her children.  The trial court did not credit her opinion.  This is a credibility determination we may not disturb on appeal.  (See *Collins v. Navistar, Inc.* (2013) 214 Cal.App.4th 1486, 1515 ["[d]eterminations of credibility are not disturbed on appeal"]; *In re Juan G.* (2003) 112 Cal.App.4th 1, 6 ["[t]he function of an appellate court is not to reweigh the evidence and substitute its judgment for that of the juvenile court"].)

of his life and expressed a desire to live with her again.  He had been having unsupervised overnight visits in her home, and "[t]here was apparently no woman in his life other than Mother with whom he had a beneficial relationship." (*Ibid.*)  The facts in this case are very different.  The juvenile court did not find Ruth D.'s relationship with Z.A. was parental, and, although Z.A. stated she wanted to live with her mother, Z.A. also stated that she loved and wanted to live with her aunts.  Nor did Ruth D. present a study by a psychologist.  Finally, Ruth D. lost her right to unsupervised visits early in the dependency proceedings and never regained them prior to termination of her parental rights.

On this record, the juvenile court acted well within its discretion in concluding that termination of the parent-child relationship would not be detrimental to Z.A.  Because Ruth D. did not overcome the preference for adoption, the juvenile court properly terminated her parental rights over Z.A.  Termination of Ruth D.'s parental rights will allow Z.A. to achieve permanence and stability in her life, together with her brothers, in her aunts' loving home.

**DISPOSITION**

The order is affirmed.

SEGAL, J.[*]

We concur:

PERLUSS, P. J.                    WOODS, J.

---

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.